UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. |
| 2015 FORD EXPLORER, VIN: 1FM5K8F82FGC35877, | ) |
| APPROXIMATELY NINETY-SEVEN THOUSAND, FOUR HUNDRED FIFTY-FOUR DOLLARS AND FORTY-SEVEN CENTS ($97,454.47) FROM FIRST COLLINSVILLE BANK, ACCOUNT NO. 0349301501 IN THE NAME OF ALAN D. JOHNSON, | ) |
| and | ) |
| APPROXIMATELY THREE HUNDRED, SEVENTY-FOUR THOUSAND, THREE HUNDRED TWENTY-ONE DOLLARS AND SIXTY-THREE CENTS ($374,321.63) FROM CHARLES SCHWAB ACCOUNT NO. 1299-1238 IN THE NAME OF ALAN D. JOHNSON, | ) |
| Defendants. | |

**VERIFIED COMPLAINT FOR FORFEITURE**

COMES NOW Plaintiff the United States of America, by and through its attorneys, Carrie Costantin, Acting United States Attorney for the Eastern District of Missouri, and Gwen Carroll, Assistant United States Attorney for said district, and for its Verified Complaint for Forfeiture states as follows:

1

*Nature of the Action*

1. This is a civil action *in rem* brought by the United States, pursuant to 18 U.S.C. § 981, seeking forfeiture of all right, title, and interest in the above-captioned defendant property, which is property derived from proceeds of mail fraud in violation of 18 U.S.C. § 1341 and/or property involved in attempted money laundering and unlawful monetary transactions in violation of 18 U.S.C. §§ 1956 and 1957.

2. The defendant property includes a 2015 Ford Explorer, VIN: 1FM5K8F82FGC35877 (the "Explorer").

3. The defendant property includes approximately $97,454.47 from First Collinsville Bank, account number 0349301501 in the name of Alan D. Johnson (the "FCB Account").

4. The defendant property includes approximately $374,321.63 from Charles Schwab, account number 1299-1238 in the name of Alan D. Johnson (the "Schwab Account").

*Jurisdiction and Venue*

5. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1345, and 1355 because this is a civil action arising under the laws of the United States, because it is a proceeding of forfeiture, and because it has been brought by the United States.

6. This Court has jurisdiction over the parties pursuant to 28 U.S.C. §§ 1345 and 1355 because this is a proceeding for forfeiture, and because it has been brought by the United States.

7. Venue is placed in the Eastern District of Missouri pursuant to 28 U.S.C. § 1355 because an act giving rise to the forfeiture occurred in the Eastern District of Missouri and because the defendant property is located within the Eastern District of Missouri.

*Basis for Forfeiture*

8. The defendant property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) because it is property involved in an attempted violation of 18 U.S.C. § 1956 and/or § 1957, as set forth in detail below.

9. The defendant property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) because it is personal property that constitutes or is derived from a violation of 18 U.S.C. § 1341 or a conspiracy to commit such offense, as set forth in detail below.

*The Specified Unlawful Activity: The Mail Fraud Scheme*

10. A St. Louis-based company, referred to herein as "BMI," is and was at all relevant times a manufacturer of chemicals for the oil and gas industry.

11. For approximately 25 years, BMI employed Alan D. Johnson ("Johnson"), until his retirement on or about December 30, 2014.

12. During that time, Johnson was, in part, responsible for purchasing equipment on behalf of BMI.

13. Beginning as early as December 2008, Johnson conspired with another individual, referred to herein as "B.W.," to deprive BMI of money and property and to deprive BMI of its intangible right to honest services, all through the use of material fraudulent representations and promises.

14. In the course of the scheme and conspiracy, Johnson caused BMI to pay dramatically inflated prices for industrial equipment components provide to BMI by Controls Plus, a company operated by B.W.

3

15. From 2004 through April 2015, B.W. was the owner and only employee of Controls Plus.

16. In the course of the scheme and conspiracy, Johnson assisted B.W. in creating false invoices that stated prices for the purchased components that were well in excess of their actual value.

17. In the course of the scheme and conspiracy, B.W. paid a portion of the funds received from BMI to Johnson as a kickback, thereby depriving BMI of its right to Johnson's honest services.

18. On or about January 25, 2011, Johnson signed a BMI Non-Disclosure, Conflict of Interest and Confidentiality Agreement (the "Agreement"), which stated in part, "I will not accept gifts, excessive entertainment, services of tangible value, or other favors (over $50.00 cumulative over a 12 month period) from any outside concern that does, or to my knowledge is seeking to do, business with BMI under circumstances in which it might be inferred that such action was intended to influence me in the performance of my duties" (the "Promise").

19. The Promise was a false promise, insofar as at the time he made it, Johnson did not intend to keep the Promise.

20. Over the course of time, Johnson received more than $150,000.00 in kickbacks from B.W., in conjunction with the purchase of approximately $1.9 million worth of equipment by BMI from Controls Plus.

21. B.W. received at least $500,000.00 from BMI from 2011 to 2015 in conjunction with the purchase of equipment by BMI from Controls Plus.

22. At no time did B.W. or Controls Plus have a contract with Johnson himself that would have entitled Johnson to such payments.

23. At no time did B.W. or Controls Plus receive an invoice payable to Johnson personally, nor did Johnson personally render services to B.W. or Controls Plus that would have entitled Johnson to such payments.

### *Funding of FCB Account with Proceeds of the Scheme and Property Involved in Money Laundering*

24. At least 17 checks from B.W. dba Controls Plus for the total amount of approximately $132,883.60 were deposited by Johnson into the FCB Account, which payments constitute kickbacks from the fraudulent scheme described above.

25. The checks were deposited between approximately December 19, 2011 and March 16, 2015.

26. Two checks totaling approximately $22,235.00 were deposited after Johnson had retired from BWI.

27. An additional five checks from B.W. dba Controls Plus totaling $35,009.08 were issued to Johnson between January 6, 2009 and November 17, 2010.

28. Between approximately January 2011 and December 2014, when he retired from BWI, Johnson received approximately $673,730.00 in salary and bonus payments from BWI by check or direct deposit, which were likewise deposited into FCB Account and which served as the primary source of funding for the FCB Account.

29. The kickbacks described above were commingled with Johnson's salary and other receipts in the FCB Account, where they were in part spent on Johnson's expenses and, as set forth below, in part transferred to one or another of Johnson's investment accounts.

30. In the course of the scheme, Johnson caused mailings to be deposited and sent through the U.S. Postal Service or through a private interstate carrier.

### *Funding of the Schwab Account with Proceeds of the Scheme and Property Involved in Money Laundering*

31. During the scheme, Johnson also held an account at RBC Wealth Management ending in 0575 (the "RBC Account").

32. Between January 1, 2011 and June 30, 2012, four transfers totaling approximately $180,000.00 were made from the FCB Account to the RBC Account, in the following approximate amounts: $30,000.00 on or about January 14, 2011; $50,000.00 on or about October 3, 2011; $50,000.00 on or about April 27, 2012; and $50,000.00 on or about June 7, 2012.

33. In June and July 2013, Johnson transferred his investments in the RBC Account, totaling approximately $872,221.52, to the Schwab Account.

34. Thereafter, two transfers totaling approximately $150,000.00 were made to the Schwab Account from the FCB Account, in the following approximate amounts: $100,000.00 on or about July 19, 2013; and $50,000.00 on or about January 16, 2014.

35. Since that time, there have not been significant withdrawals from either the RBC Account or the Schwab Account, and the Schwab Account's balance has never dropped below $872,221.52 since it was opened in July 2013.

36. Thus, approximately $330,000.00 of the funds in the Schwab Account would not have been deposited therein if not for the fraudulent scheme and thus constitute proceeds of said scheme and property involved in money laundering and/or unlawful monetary transactions.

37. As an investment account, the Schwab Account experienced growth in value during the course of the scheme.

38. At least $44,321.63 in growth in the Schwab Account is traceable to the $330,000.00 in funds deposited from the FBC Account.

### *Purchase of 2015 Ford Explorer with Proceeds of Scheme*

39. On or about April 30, 2015, check #6556, in the approximate amount of $17,220.00 was made payable to Jack Schmitt Ford (the "First Check").

40. The First Check was drawn on the FCB Account.

41. The memo on the First Check was "New Car."

42. The First Check was signed by Johnson.

43. On or about May 5, 2015, check #6559, in the approximate amount of $1,000.00 was made payable to Jack Schmitt Ford (the "Second Check").

44. The Second Check was likewise drawn the FCB Account.

45. The memo on the Second Check was "2015 Explorer."

46. The Second Check was signed by Johnson.

47. On or about May 5, 2015, Johnson purchased the Explorer from Jack Schmitt Ford Lincoln in Collinsville, Illinois, for approximately $41,616.00.

48. Johnson received an approximately $25,000.00 trade-in allowance on a 2012 Cadillac SRX in connection with the purchase of the Explorer.

49. The purchase of the Explorer was funded in part with proceeds of the crimes described above and/or property involved in money laundering and/or unlawful monetary transactions, as set forth in detail below.

50. On or about March 16, 2015, Johnson deposited a check from Controls Plus in the approximate amount of $11,117.50 into the FBC Account.

51. Between March 16, 2015 and April 30, 2015, when the Explorer was purchased, the balance in the FBC Account did not drop below $11,117.50.

52. Thus, at least $11,117.50 in kickbacks and/or property involved in money laundering are traceable to the purchase of the Explorer.

### *Count I — Forfeiture as Proceeds of Mail Fraud and Conspiracy to Commit Mail Fraud*
**(Against All Defendants)**

53. Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

54. Section 981(a)(l)(C) of Title 18 provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of [Title 18], or a conspiracy to commit such offense" is subject to forfeiture.

55. Section 1956(c)(7) of Title 18 defines "specified unlawful activity" to include "any act or activity constituting an offense listed in section 1961(1)" of Title 18, with certain exceptions inapplicable here.

56. Among the offenses listed in Section 1961(1) is "any act which is indictable under . . . section 1341 (relating to mail fraud)."

57. Section 1341 of Title 18 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing" has committed a criminal offense.

58. Title 18, United States Code, Section 1346 defines the term "scheme or artifice to defraud" in Section 1341 to include "a scheme or artifice to deprive another of the intangible right of honest services."

59. The defendant property is subject to forfeiture because it constitutes or is derived from proceeds traceable to mail fraud and conspiracy to commit mail fraud.

60. With respect to each of the accounts in which the defendant funds were found, there was previously on deposit in that account an amount of funds derived from mail fraud and the conspiracy to commit mail fraud described above that exceeds the amount of funds seized from said account.

WHEREFORE the United States prays that this Court decree that all right, title, and interest in the defendant property be condemned and forfeited to the United States of America, and for such other and further relief as the Court deems just and proper.

*Count II — Forfeiture as Property Involved in Money Laundering
and Unlawful Monetary Transactions and Property Traceable Thereto*
**(Against All Defendants)**

61. Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

62. Section 981(a)(1)(A) of Title 18 provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section . . . 1956 [or] 1957 of [Title 18], or any property traceable to such property" is subject to forfeiture.

63. Section 1957 of Title 18 provides that whoever, within the United States, "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity" has committed a criminal offense.

64. Section 1956(a)(1)(B) of Title 18 makes it a crime for anyone, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, to conduct or attempt to conduct a financial transaction which in fact involves proceeds of a specified unlawful activity, knowing that the transaction is designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity or to avoid a transaction reporting requirement under federal law.

65. "Specified unlawful activity" is defined in Section 1956 and its cross-references to include money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(B), unlawful monetary transactions in violation of Title 18, United States Code, Section 1957, and mail fraud in violation of Title 18, United States Code, Section 1341.

66. The defendant funds constitute property involved in money laundering and unlawful monetary transactions in violation of Title 18, United States Code, Sections 1956(a)(1)(B) and 1957.

67. With respect to each of the accounts in which the defendant funds were found, there was previously on deposit in that account an amount of funds involved in money laundering and in the money laundering conspiracy described above that exceeds the amount of funds seized from said account.

WHEREFORE the United States prays that this Court decree that all right, title, and interest in the defendant property be condemned and forfeited to the United States of America, and for such other and further relief as the Court deems just and proper.

Dated: July 11, 2017

Respectfully submitted,

CARRIE COSTANTIN
Acting United States Attorney

*/s/ Gwen Carroll*
GWEN CARROLL, #4657003NY
Assistant United States Attorney
111 South 10th Street, Suite 20.333
Saint Louis, Missouri 63102
Telephone: (314) 539-2200
Facsimile: (314) 539-2287

## **VERIFICATION**

I, Jeffrey A. Johnson, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 7/10/17
(date)

Jeffrey A. Johnson
Special Agent
Federal Bureau of Investigation